Page 1

1        IN THE UNITED STATES DISTRICT COURT

              NORTHERN DISTRICT OF OHIO

2               EASTERN DIVISION

3       ~~~~~~~~~~~~~~~~~~~~

4  LINDA GARRETT,

5

6         Plaintiff,

7

8    vs.          Case No.  1:14-CV-00409

9

10  UNIVERSITY HOSPITALS OF

    CLEVELAND, et al.,

11

12         Defendant.

13       ~~~~~~~~~~~~~~~~~~~~

14         Deposition of

          JULIE CHESTER

15

        November 24, 2014

16         9:42 a.m.

17         Taken at:

      Thorman Petrov Griffin

18       3100 Terminal Tower

        50 Public Square

19      Cleveland, Ohio 44113

20

21    Tracy Morse, RPR and Notary Public

22

23

24

25

PLAINTIFF'S
EXHIBIT
2
ALL-STATE LEGAL®

1    an HR generalist to a manager of a community

2    hospital, Geauga Medical Center.  I moved back

3    to the main campus as a manager of employee

4    relations, then a manager of human resources,

5    director of human resources and now my position

6    today as vice president.

7         Q.    All right.  Recognizing that you

8    probably won't be able to give exact dates, if

9    you can give me ranges of how long.  And maybe

10   it's easier going back in time.  So you're

11   currently the VP of HR and you've held that job

12   for about nine months?

13        A.    Yeah, exactly.

14        Q.    And before that, you were director

15   of human resources?

16        A.    Right.

17        Q.    Responsible for the academic

18   medical center?

19        A.    Correct.

20        Q.    Okay.  And approximately how long

21   did you hold that position?

22        A.    Approximately seven years.

23        Q.    Okay.  So that takes us back to

24   around 2007 or so?

25        A.    Yes.

Page 21

1         Q.    In that timeframe?

2         A.    Yes.  End of 2007.

3         Q.    And your position before that was

4    manager of human resources?

5         A.    Correct, at the academic medical

6    center.

7         Q.    So the same facility?

8         A.    The same scope, yes.

9         Q.    How long did you hold that position

10   approximately?

11        A.    At least five years, but it could

12   be greater.  I just -- to be honest with you,

13   I'd have to look at my resume or my employment

14   records to give you accurate detail of the

15   dates.

16        Q.    So for the last ten years, though,

17   at least the last ten years, you've been in a

18   human resources function at the academic

19   medical center?

20        A.    Correct.

21        Q.    Okay.  Are there differences or

22   were there differences between your

23   responsibilities as a manager as compared to a

24   director and then again as between your

25   director and current VP position?

Page 32

1   with your counsel, my understanding is that you
2   are here today to speak on behalf of UH as the
3   representative for topics f, i and k.
4           MR. PETROV:       Did I get that
5   right, Bart?
6           MR. BIXENSTINE:   I'm not absolutely
7   certain about that, but --
8           MR. PETROV:       Here, I think I
9   have an email.
10          MR. BIXENSTINE:   Yeah, you know, it
11  certainly fits with my own recollection and I
12  see the email here, so.
13          MR. PETROV:       Okay.  Just for
14  the record, Exhibit --
15          MR. BIXENSTINE:   So f, i and k.
16          THE WITNESS:      Okay.
17  BY MR. PETROV:
18      Q.   So did you have an understanding
19  that you were here in a capacity as a
20  representative for the hospital on some limited
21  topics when you came here today?
22      A.   Yes.
23      Q.   Okay.  And are you comfortable
24  testifying in that capacity?
25      A.   Yes.

Page 35

1    her conduct warranted termination, correct?

2          A.    Correct.

3          Q.    You certainly have learned things

4    in the course of your duties about Ms. Garrett

5    and the facts and circumstances of her

6    employment at University Hospitals, correct?

7          A.    Yes.

8          Q.    That is information that came to

9    you from other people, correct?

10         A.    Yes.

11         Q.    And those people would be

12   Ms. Blankschaen or Ms. Lyons?

13         A.    Ms. Lyons or Cyndi Beattie, my two

14   HR managers.

15         Q.    Did you ever have any communication

16   directly with Sue Blankschaen?

17         A.    No.

18         Q.    Did you ever participate in

19   conversation of any kind -- well, let me back

20   up, because I want to make sure I set the

21   timeframe here.   Prior to Ms. Garrett's

22   termination, did you ever participate in any

23   conversation in which Ms. Blankschaen also

24   participated regarding Linda Garrett?

25         A.    No.

Page 38

1        Q.    Okay.  I understand that you are
2   not the representative regarding the reasons
3   for Ms. Garrett's termination itself.  I'm just
4   stating that for the record.  But you do have a
5   personal understanding about the reasons she
6   was terminated from employment, correct?
7        A.    Yes.
8        Q.    And your understanding is that she
9   was terminated because her position was
10  eliminated, correct?
11       A.    Yes.
12       Q.    I'm kind of doubling down on some
13  of my prior questions, but just to make sure.
14  Your understanding is that she was not
15  terminated for any reason related to her work
16  performance, correct?
17       A.    Yes.
18       Q.    She was not terminated for any
19  reason related to her conduct as a University
20  Hospitals employee, correct?
21       A.    Yes.
22                  -   -   -   -   -
23                  (Thereupon, Deposition Exhibit 27,
24                  Defendant's Response to Plaintiff's
25                  First Set of Discovery Requests to

Page 42

1    recommendation to Lisa Venn," correct?

2         A.    Yes, that's what it says.

3         Q.    And the next sentence says, "Based

4    on that recommendation, Susan Blankschaen,

5    Director Hemodialysis & Ambulatory Services,

6    date of birth 8/31/55, made the decision that

7    Plaintiff's job responsibilities would no

8    longer include entering data into CROWNWeb."

9    And that statement is true, correct?

10        A.    Yes.

11        Q.    And then the next sentence says,

12   "Ms. Blankschaen made the decision to eliminate

13   Plaintiff's position." And your belief is that

14   that statement is also true, correct?

15        A.    Yes.

16        Q.    Now, in reading this, it's -- I

17   mean, your name does not appear in that

18   paragraph, correct?

19        A.    Correct.

20        Q.    Okay. And I take it that it's your

21   testimony that you played no role in the

22   decision to remove CROWNWeb duties from

23   Ms. Garrett's job responsibilities, correct?

24        A.    No.

25        Q.    You did not make the decision to

Page 43

1    remove the responsibilities of CROWNWeb from

2    her job responsibilities, correct?

3            A.     Correct.

4            Q.     And you did not make the decision

5    to eliminate her position, correct?

6            A.     Correct.

7            Q.     You did not make the decision to

8    terminate Ms. Garrett's employment, correct?

9            A.     Correct.

10           Q.     So if anyone were to testify to

11   that fact, from your point of view, that

12   statement would be false, correct?  Let me make

13   the question clearer.

14           A.     Yeah.

15           Q.     If someone were to testify, "Julie

16   Chester decided to eliminate Linda Garrett's

17   position," you believe that that statement

18   would be false, correct?

19           A.     Repeat that again.

20           Q.     Sure.  I can make it even shorter.

21   You believe that this statement, "Julie Chester

22   made the decision to eliminate Linda Garrett's

23   position," you believe that statement is false,

24   correct?

25           A.     Correct.

Page 53

1          Q.    So during that call, do you
2     recall -- there's too many, Calls, in that
3     sentence.
4          A.    I know.
5          Q.    Do you recall who shared the
6     results of the quality audit during that phone
7     call?
8          A.    Lisa Venn shared the results of the
9     audit during that call.
10         Q.    Okay.  And generally speaking,
11    there was discussion about those results and
12    what you describe as next steps?
13         A.    Yes.
14         Q.    And at the conclusion of that
15    meeting, had any next steps been decided upon?
16         A.    Yes.
17         Q.    And do you remember what they were?
18         A.    Yes.  So based on the results from
19    the quality institute indicating that a
20    clinical person needed to do Linda Garrett's
21    job, it was HR's recommendation to eliminate
22    Ms. Garrett's position.
23         Q.    Okay.  Are you aware of whether
24    prior to that phone call human resources had
25    had any preliminary discussion -- and let me

Page 54

1   back up.   When I say, "Human resources," I mean

2   you or Erin Lyons or anyone under your

3   supervision, authority, direction.

4         A.    Okay.

5         Q.    Had human resources had any

6   preliminary discussion with Ms. Blankschaen in

7   advance of that call?

8         A.    No --

9         Q.    Okay.  So --

10        A.    -- well, not that I'm aware of.

11        Q.    Okay.  So --

12              MR. BIXENSTINE:  And of course -- I

13  think what you mean is preliminary discussions

14  with Blankschaen concerning the topics on the

15  call.  I mean --

16              MR. PETROV:     Yeah.

17              MR. BIXENSTINE:  -- there's tons of

18  conversations that go on --

19              THE WITNESS:    Right.

20              MR. BIXENSTINE:  -- between HR and

21  Blankschaen, you know.  So with that in mind,

22  perhaps --

23  BY MR. PETROV:

24        Q.    Okay.  So at the conclusion of the

25  phone call that you recall, there was a

Page 55

1    recommendation by human resources to eliminate

2    Ms. Garrett's position?

3         A.    Correct.

4         Q.    To whom was that recommendation

5    communicated next?

6         A.    To Robin Rowell, who's the vice

7    president over the clinical institute

8    operations.  Susan Blankschaen reports to

9    Robin.

10        Q.    And do you know who communicated --

11        A.    Cyndi Beattie.

12        Q.    Okay.  And do you know when Cyndi

13   communicated that to Robin?

14        A.    After the call.

15        Q.    Do you know how much time elapsed?

16        A.    No.

17        Q.    Do you know how she did it?

18        A.    No.

19        Q.    Do you have any understanding of

20   what happened with the recommendation, after it

21   reached Ms. Rowell?

22        A.    Yes.  Her position was

23   eliminated -- the document you just showed

24   me -- February 26, Ms. Garrett's position.

25        Q.    Well, I guess where I'm missing

Page 56

1    information or I feel like I'm missing
2    information; your sworn interrogatory answer
3    indicates that Ms. Blankschaen made the
4    decision to eliminate her position.
5         A.    Right.  It's HR's recommendation,
6    but it's always the hiring manager, the
7    business leader's ultimate decision to make
8    that employment action.
9         Q.    But I guess what I'm asking is:  So
10   far, you're aware that the information about
11   the recommendation was communicated to Robin
12   Rowell?
13        A.    Correct --
14        Q.    Do you know --
15        A.    -- and then somehow from Robin, it
16   went back to Sue, obviously, but that was HR's
17   recommendation.
18        Q.    But you have no --
19        A.    I have no recollection in terms of
20   the timing or how that occurred.
21        Q.    Okay.  So you never participated in
22   a phone call on the topic of Ms. Garrett's
23   employment future with the hospital in which
24   Ms. Blankschaen also participated, correct?
25        A.    Correct.

Page 57

1    Q.    And you never informed
2    Ms. Blankschaen directly that human resources
3    was recommending the elimination of the
4    position, correct?
5         A.    Correct.
6         Q.    Certainly Ms. Blankschaen would be
7    free to make whatever decision she felt best as
8    a manager for her department, correct?
9         A.    Correct.
10        Q.    Ms. Blankschaen would be required
11   to follow the direction of compliance that
12   CROWNWeb -- let me try that question again.
13        Compliance had issued a directive that
14   whoever is responsible for entering data into
15   CROWNWeb should be someone with a clinical
16   background, correct?
17        A.    No.  It wasn't compliance's
18   recommendation.  It was an independent audit
19   completed by our quality institute and those
20   results were given back to compliance --
21        Q.    Okay.
22        A.    -- under the compliance umbrella.
23        Q.    When you say, "Independent audit,"
24   what does that mean?  As that term is used at
25   University Hospitals, what does, "Independent

Page 61

1    been within her rights to adopt the quality
2    recommendation but not terminate Ms. Garrett's
3    employment, correct, if there were other
4    positions, opportunities, tasks for her to
5    perform?

6        A.    I guess you could say that's
7    correct, yes.

8        Q.    Did you participate in any
9    discussion at any time prior to Ms. Garrett's
10   termination about whether there were other
11   opportunities in the department for her?

12       A.    Yes.   Because I think at the time
13   when we were doing the audit, it was going to
14   take some time to pull the charts and the data
15   together, so there was concern of, What is
16   Ms. Garrett going to be doing for this portion
17   of her time.   So we did start looking for other
18   opportunities that we could maybe, you know,
19   temporarily have her work in.

20       Q.    Okay.   And we'll talk about those.
21   You're describing, I think in that answer
22   discussion about opportunities to find her
23   temporary work assignments while the audit was
24   conducted.

25       A.    Correct, right.

Page 62

1         Q.    Did you participate in any

2 discussion in which permanent opportunities for

3 Ms. Garrett were discussed?

4         A.    No.

5         Q.    Your understanding is that

6 Ms. Garrett, at the time of her termination,

7 was eligible for rehire or transfer, correct?

8         A.    Yes.

9         Q.    Are you aware that in fact that her

10 supervisor recommended her for rehire or

11 transfer?

12         A.    That's what's in her record, yes.

13         Q.    But other than seeing that, do you

14 have any --

15         A.    No.

16         Q.    You don't dispute that --

17         A.    No.

18         Q.    -- what's in the records?

19         A.    I do not dispute that, no.

20         Q.    Okay.  Your understanding is that

21 the only reason that Ms. Garrett was not

22 rehired or transferred or reassigned after her

23 position elimination was that there were no

24 open positions for which she was qualified?

25         A.    There was plenty of opportunities

Page 63

1   for Ms. Garrett to apply for, but she decided
2   not to apply for any.
3          Q.    So your understanding is that the
4   only reason she wasn't placed in any other
5   position is that she did not apply for any
6   other position?
7          A.    Correct.  Under our reduction in
8   workforce policy, she still needs to express
9   interest in a position.
10         Q.    Okay.  Well, certainly if
11  Ms. Blankschaen had decided to or had an
12  interest in moving Ms. Garrett into another
13  open position, she would have the authority to
14  offer that without an application, correct?
15         A.    She would still need to post the
16  position within her department --
17         Q.    Okay.
18         A.    -- Ms. Blankschaen would.
19         Q.    Sure.  But there would be nothing
20  that would stop Ms. Blankschaen from
21  approaching Linda and saying, "Linda, You
22  should seriously consider this opportunity.
23  Would you be interested in it?" correct?
24         A.    A manager could solicit all of
25  their employees, not just one employee, yes,

Page 64

1   absolutely.

2        Q.    I understand.  What you're saying

3   is that if she did that, she would have to

4   follow opportunities to make it fair for all of

5   the applicants, correct?

6        A.    Correct.

7        Q.    But assuming that procedures and

8   requirements for posting and having open

9   applications, there's nothing that prohibits a

10  manager from expressing interest to an employee

11  about potentially applying for a position,

12  correct?

13           MR. BIXENSTINE:  Objection.

14      A.    Correct.

15           MR. BIXENSTINE:  I don't think you

16  meant what you said.

17           MR. PETROV:     No.  I think --

18           MR. BIXENSTINE:  You said,

19  "Expressing interest to an employee."

20           MR. PETROV:     Yeah, that's what

21  I meant.

22           MR. BIXENSTINE:  All right.  Good

23  enough.

24           MR. PETROV:     Okay.

25           MR. BIXENSTINE:  But anyway, I

Page 65

1  still need to raise an objection. Go ahead.

2  BY MR. PETROV:

3     Q.    Okay. Let me do a couple clean-up

4  questions and then maybe we can take a short

5  break and then we're well on our way to -- I'm

6  not done yet, but we're making good progress.

7        No one ever came to you specifically to

8  complain about Linda Garrett's performance or

9  her conduct, correct?

10     A.    Correct.

11     Q.    And I assume you had no personal

12  complaint about her performance or conduct.

13     A.    Correct.

14     Q.    You never determined that she was

15  not qualified for any position that she held at

16  the hospital?

17     A.    No. She was definitely qualified

18  for multiple openings that we had available.

19     Q.    And the position that she actually

20  held, you never came to the conclusion that she

21  was not qualified, correct?

22     A.    Correct.

23     Q.    When you say that she was qualified

24  for multiple positions, your understanding is

25  that she would have been qualified for the

1  position at one time was known as a division

2  secretary position and then later became known

3  as a customer service rep position?

4       A.    I don't know the specifics of those

5  two jobs, but there was -- I mean, we have over

6  a thousand vacancies at any given time, so

7  there's plenty of opportunities that she could

8  have sought out.

9       Q.    And your understanding is that

10  Ms. Garrett was considered for none of those,

11  correct?

12      A.    Because she did not express

13  interest, correct.

14      Q.    Setting that aside, she was

15  considered for no positions at UH following her

16  termination, correct?

17      A.    Correct, because she didn't express

18  interest.

19      Q.    Well, she didn't express interest

20  to you, correct?

21      A.    Or to our recruitment staffing

22  team.

23      Q.    Well, so far as you know?

24      A.    There's no record of her applying

25  for any jobs within University Hospitals.

Page 71

1   what approvals are required for that position
2   to be filled?
3           A.    Sure.  So the hiring manager would
4   create a requisition in our system.  It would
5   go through, I don't know if it's one or two
6   levels of approval.  It would end up eventually
7   in the recruiter's box and they would post the
8   position for five business days.  During those
9   five business days, internal applicants have
10  the ability to apply for the position.  At the
11  same time you can post it externally as well,
12  but internal candidates are given first
13  consideration before it goes externally.
14          Q.    So the posting is up for longer
15  than five days.  It's just a five-day --
16          A.    Window.
17          Q.    -- head start for the internal
18  applicants?
19          A.    Yes.
20          And then from there, the recruiter would
21  screen applicants based on the minimal
22  qualifications for the position that are
23  maintained in the human resource department.
24  So if it requires a high school diploma, they
25  would screen and make sure that applicants had

1    a high school diploma, for example. Then the
2    recruiter would status those candidates on the
3    online system. What I mean by, "Status," is
4    they would say, "Qualified, Move on to manager
5    interview," or, "Reject," because they don't
6    meet the minimum qualifications. There's a
7    whole host of codes that they would fill out
8    depending on the applicant's background and
9    experience. From there, the manager would
10   interview probably the top three to five
11   candidates for the role, depending on how many
12   interviews or what the position is and how many
13   qualified applicants there are.
14       Q.   Okay. And ultimately an offer --
15       A.   Yes.
16       Q.   -- is going to be extended to some
17   person, correct?
18       A.   Correct.
19       Q.   And at UH, under that recruiting
20   and hiring practice, an offer means a firm
21   offer for a new position for the internal or
22   external candidate?
23       A.   Correct.
24       Q.   Okay. Now, is there -- you'll have
25   to be patient with me as I kind of wade my way

Page 74

1   keep her whole, so what work could she do in
2   the meantime until that audit was completed.
3        Q.    Okay.  And obviously
4   Ms. Blankschaen in connection with HR,
5   Ms. Blankschaen or Ms. Nodge, would have the
6   authority or the ability to assign Ms. Garrett
7   tasks for which she was qualified, correct?
8        A.    Correct.
9        Q.    In other words, this was not a
10  process that required the involvement of a
11  recruiter and applications on a temporary
12  basis?
13       A.    Correct, for the temporary -- for
14  this unique situation, correct, right.
15       Q.    Sure.  Okay.  What particular
16  involvement did you play in that process?
17            MR. BIXENSTINE:  And that's in
18  reference to what?  Forgive me.
19            MR. PETROV:     Sure.
20       Q.    I can be more specific.
21       A.    Yeah.
22       Q.    You are aware of an effort that
23  Ms. Blankschaen or Ms. Nodge and HR undertook
24  to try to find temporary duties for Ms. Garrett
25  to perform in the fall of 2012, correct?

1   than what you've already testified to?

2        A.    I do know that part of her

3   responsibilities -- a majority of her job was

4   doing the CROWNWeb system, but a small portion

5   was, I believe administrative duties, but I

6   don't recall exactly what duties those were.

7   So I'm sure she was doing some of those duties

8   in the department.

9        Q.    And you didn't have firsthand

10  knowledge of what the percentage of her work

11  was between CROWNWeb and other duties, correct?

12       A.    No.   It would be listed on her job

13  description, whatever those were.

14       Q.    So you came to the conclusion from

15  the job description?

16       A.    If I was outside looking in, yes,

17  looking at that and having conversations with

18  Sue Blankschaen and Megan Nodge, yes, if I was

19  looking outside in.  So my guess is that Cyndi

20  Beattie and Erin Lyons would have conversations

21  with Sue Blankschaen and Megan Nodge.

22       Q.    Although I appreciate the

23  explanation, I don't want you to guess.

24       A.    So I don't know.

25       Q.    Here's my question, my question is:

Page 78

1    This was marked in a prior deposition.

2         A.    Okay.

3         Q.    Look it over and let me know when

4    you're ready to answer questions about it.

5    I'll tell you, I'll be focused largely on the

6    first page, not the detail of the second page,

7    but if you need to read the second page, that's

8    fine of course.

9         A.    Okay.

10        Q.    Okay.  So this document has three

11   emails in chronological order.  The second one

12   is one that you sent on December 7, 2012 to

13   Erin and copying Cyndi.

14        In the next one, you write, "This is the

15   position was referring to this morning, but it

16   is part-time."  And then it looks like there is

17   part of a spreadsheet that was cut out of a

18   larger document referring to a secretary

19   division position.  Do you see that?

20        A.    Yes.  I'm sorry.

21        Q.    Did I interpret what that document

22   is correctly, that series of blocks across the

23   page?

24        A.    This was, yeah, a position from a

25   larger spreadsheet with all of the new vacancy

Page 79

1   requests that came through.

2        Q.    Okay.  And your email references,

3   it looks like a conversation or some

4   communication that morning.

5        A.    I probably had a conversation with

6   Cyndi and Erin that morning briefing me on the

7   case, is my guess.

8        Q.    Okay.  So you believe that this was

9   in reference to something you were discussing

10  in reference to Ms. Garrett?

11       A.    Yes.

12       Q.    Do you recall any additional detail

13  about what you discussed with Erin and Cyndi on

14  this topic on December 7, 2012?

15       A.    No.

16       Q.    Well, certainly at this point in

17  time, Linda had been removed from her CROWNWeb

18  duties, correct?

19       A.    Yes.

20       Q.    And it was uncertain at this time

21  whether she would be allowed to return to them,

22  correct?

23       A.    Right.  We were waiting for the

24  results of the audit, yes.

25       Q.    And certainly one of the results of

Page 81

1       A.    Correct.

2       Q.    But you knew that there were going

3   to be results, correct?

4       A.    Correct.

5       Q.    And one of the results potentially

6   of the audit was that, Linda can't do this job,

7   correct?

8       A.    Correct.

9       Q.    Either because she's not qualified

10  to do it or because her performance was poor or

11  for some other reason?

12      A.    Right.  Or she could continue doing

13  her job.

14      Q.    That's right.

15      A.    Right.

16      Q.    My point is, her future --

17      A.    Was unknown at that time.

18      Q.    -- her future was unknown.  And one

19  of the possibilities was that she would no

20  longer have a job available to her after the

21  results of the audit came in, correct?

22      A.    We had a review -- we didn't have

23  the results at that time, so we had to review

24  the results, but that is one possibility, yes.

25      Q.    That's all I'm asking.

Page 82

1          A.     Yes.

2          Q.     So at least in December of 2012,

3    the possibility that Linda's position would be

4    eliminated or would be changed in a way that

5    would eliminate her from being qualified for it

6    was something that you, Erin and Cyndi were

7    aware of, correct?

8          A.     Correct.

9          Q.     Did you have any discussion with

10   anyone in the department, whether it's Susan or

11   Megan or Carlton, about other opportunities for

12   Linda either on a temporary or a permanent

13   basis?

14         A.     I don't recall having any

15   conversations with either of them.

16         Q.     At least in December of 2012, you

17   certainly felt that the division secretary job

18   was one possible position to discuss for Linda,

19   correct?

20         A.     Right, but I think this was a

21   temporary position at this time.

22         Q.     Do you know that?

23         A.     Yes, because it's after she was

24   removed from her duties and we were trying to

25   make sure that she had work to do.

Page 83

1       Q.    Okay.  My question is a little

2  different, which is:  You considered that this

3  could be one opportunity for her to find

4  employment, correct?

5       A.    Down the road, if that's what the

6  results indicated, yes.

7       Q.    And based on your knowledge of the

8  position and of Linda, you believe she was

9  qualified for this position, correct?

10      A.    Division secretary, yes.

11      Q.    Now, you make a reference to the

12 job being part-time.

13      A.    Um-hum.

14      Q.    As I read your email, it suggests

15 that the job being part-time was one reason to

16 not discuss it with Linda or not discuss it

17 with department management about a possibility.

18 Is that fair?

19      A.    I don't know if it's fair, because

20 I don't recall the exact conversation I had

21 with Cyndi or Erin --

22      Q.    Okay.

23      A.    -- but Linda was full-time and this

24 position was only part-time.  That was probably

25 the reference I was making in this email.

Page 84

1        Q.    Did that mean to you at the time
2   that the position being part-time therefore was
3   one that we need not discuss with Linda?
4        A.    No.
5        Q.    Do you know whether this job was
6   filled?
7        A.    No.
8        Q.    Have you ever heard of or met an
9   employee named Shron Pinkney at the hospital?
10       A.    No.
11       Q.    So you probably don't know whether
12  Ms. Pinkney is full-time or part-time.
13       A.    Correct.  I do not know.
14       Q.    Certainly the process for -- well,
15  let me just ask you.  In December 2012, if this
16  job were listed as part-time but the manager
17  felt the job should be full-time upon hiring,
18  who has the authority to make that change?
19       A.    Well, the hiring manager would make
20  that decision and then she would have to submit
21  the requisition back through our workforce
22  control system, the approval system, to make it
23  happen again.
24       Q.    Okay.  So in this case, the hiring
25  manager is listed as Stanley Betts, Carlton

Page 85

1    Betts, correct?

2         A.    Correct.

3         Q.    So if Mr. Betts wanted to fill this

4    job and wanted to fill it as full-time, he

5    would make that decision and then make a

6    requisition for approval?

7         A.    Correct.

8         Q.    And to whom would that request for

9    approval go?

10        A.    It would go through the normal

11   hierarchy.  So it would go through Sue

12   Blankschaen and then maybe up one level as well

13   to the next level of leadership.

14        Q.    Would the records of the hospital

15   reflect that process of approvals?  Is it

16   something that's done electronically or --

17        A.    It's electronically.

18        Q.    Do you know if you would be able to

19   view that or audit it?

20        A.    I don't think I can even view that.

21   I think it just automatically happens, because

22   it's based on the Oracle hierarchy system, but

23   I never obtained that myself to show the --

24        Q.    Oh, I'm sure --

25        A.    Yeah.

Page 90

1    Ms. Garrett went directly to compliance?

2         A.    I was made aware that she went to

3    compliance, yes.

4         Q.    Are you aware that either in her

5    conversations with Ms. Lyons or in her

6    conversations with compliance that she

7    communicated a belief that the data that was

8    being entered into CROWNWeb was false?

9         A.    I learned that after the fact, yes.

10        Q.    Okay.  I'm not saying you came to

11   the same conclusion.

12        A.    Right.

13        Q.    You learned that she made that

14   communication?

15        A.    Yes.

16        Q.    When you say, "After the fact" --

17        A.    Well, after the fact that she filed

18   the compliance call.

19        Q.    But before her termination?

20        A.    Correct.

21        Q.    Okay.  How were you made aware of

22   that fact?

23        I mean, you didn't hear it from Linda

24   herself, correct?

25        A.    Correct.

Page 91

1          I don't recall.

2          Q.    Is it fair to say that among this

3     working group of Erin and Cyndi and the

4     compliance and quality group, that everyone

5     shared that common knowledge?

6          A.    Yes.

7                     -   -   -   -   -

8                (Thereupon, Deposition Exhibit 267,

9                12/17/12 Emaiil To Cyndi Beattie and

10               Julie Chester From Erin Lyons, Etc.,

11               was marked for purposes of

12               identification.)

13                    -   -   -   -   -

14         Q.    Okay.   This is Exhibit 267.  It's a

15    new exhibit.   Julie, take a minute and read

16    through that and let me know when you're ready

17    to talk about it.

18         A.    Okay.

19         Q.    As I look at Exhibit 267, there are

20    two emails.   They're both from Erin Lyons, both

21    to Cyndi Beattie and you on December 17, right?

22         A.    Yes.

23         Q.    And apparently Erin had a

24    December 12 meeting with Dr. Wish.

25         A.    Yes.

Page 96

1    time, that division secretary job was still
2    open, correct?
3           A.    I do not know that.
4           Q.    Okay.  You don't know one way or
5    the other?
6           A.    Correct, if it was filled or --
7           Q.    Okay.  This document contemplates
8    the possibility, the possibility of extending
9    an offer to Ms. Garrett for one of these jobs,
10   correct?  I'll show you what I'm pointing to.
11   That Erin asked Patty Collins, "not to extend
12   an offer before checking with me," correct?
13          A.    Correct.
14          Q.    Okay.  So at least based on your
15   discussions with Ms. Lyons, you understood that
16   Erin thought that one possibility would be
17   offering one of these positions to Ms. Garrett,
18   correct?
19          A.    I wouldn't say offering, per se,
20   but just making sure she meets the minimum
21   qualifications first even before you get to an
22   offer stage.  She's probably just seeing if she
23   meets the minimum qualifications for that role.
24          Q.    Okay.  Sure.  I understand that.
25          A.    Yeah.

Page 97

1        Q.    Of course qualification analysis is

2    one part of any job --

3        A.    Sure.

4        Q.    -- but if that were met, one of the

5    possibilities is that an offer might be made,

6    correct?

7        A.    Correct.

8        Q.    And, in fact, Erin was sufficiently

9    concerned about that that she instructed Patty

10   to not extend an offer before checking with HR,

11   correct?

12       A.    Correct.

13       Q.    Okay.  Linda had not applied for

14   these jobs, to your knowledge, correct?

15       A.    Correct.  I don't know.

16       Q.    Well, you said based on your review

17   of the documents we requested, you found no

18   record of any application from her of any kind,

19   correct?

20       A.    I was going off the timeframe after

21   Ms. Garrett was terminated and my earlier

22   comments --

23       Q.    Okay.  Did you --

24       A.    -- so I was not aware if she

25   applied for any jobs during this timeframe

Page 99

1          A.    Correct.  But if you look at the

2     timeframe, it was the month of December and

3     that's when Ms. Garrett was removed, so we

4     didn't have the results until the following --

5          Q.    I just want to be clear about what

6     the document is saying, though.

7          A.    Okay.

8          Q.    They do say, In December 2012.

9          A.    Correct.

10         Q.    And they talk about, The status of

11    the two positions we discussed.

12         A.    Correct.

13         Q.    And, "Not extending an offer before

14    checking with me," correct?

15         A.    Correct.

16         Q.    And they do not reference temporary

17    employment for Ms. Garrett, correct?

18         A.    Correct.

19         Q.    Okay.  Are you aware of any

20    communication in which the possibility of

21    temporary reassignment is discussed for

22    Ms. Garrett?

23         A.    Repeat that again.

24         Q.    Sure.

25         A.    Am I aware of --

Page 103

1   look for other opportunities to see if she

2   could work potentially in other areas until the

3   audit was completed.  So that is what these

4   emails are referring to.

5        Q.    My question is:  In December 2012,

6   you're discussing the possibility of offering

7   her one of those opportunities, correct?

8        A.    Not offering, no.

9        Q.    Well, Erin Lyons specifically

10  references the process by which an offer might

11  be made through Patty Collins, correct?

12       A.    No.  She's referring to offers to

13  other applicants.

14       Q.    Oh, is she?  Where does she say

15  that?

16       A.    "Not to extend an offer before

17  checking with me," because she's getting ready

18  to extend an offer for the position to other

19  applicants.

20       Q.    Including potentially Ms. Garrett,

21  correct?

22       A.    Potentially, correct.

23       Q.    And if that were to happen, you

24  required no application from Ms. Garrett prior

25  to -- for this process to even start, correct?

Page 105

1  either of the jobs discussed in 267
2  specifically, correct, to your knowledge?
3         A.    To my knowledge, I'm not aware of
4  what positions she applied for.
5         Q.    And to your knowledge, she didn't
6  express interest in any other job prior to her
7  termination, correct?
8         A.    Correct.
9         Q.    And the reason for that is because
10  no one ever told -- to your knowledge, no one
11  ever told Ms. Garrett that she was in danger of
12  losing her job, correct?
13               MR. BIXENSTINE:  Objection.
14         A.    We wouldn't tell her that, because
15  we don't know at this time.  We don't have the
16  result of the audit.
17         Q.    You're providing explanations,
18  which I understand, but my question was:  To
19  your knowledge, no one communicated the fact
20  that Ms. Garrett was in jeopardy of losing her
21  job to her prior to February 26, 2013, correct?
22               MR. BIXENSTINE:  Objection.
23         A.    Correct.
24         Q.    And you would agree that if she had
25  known that one potential result of the audit

1  might be that she might lose her job that she

2  likely would apply for other jobs available in

3  December and January, correct?

4              MR. BIXENSTINE:  Objection.

5       A.     I don't know what Ms. Garrett would

6  have done.

7       Q.     What would you have done in that

8  circumstance?

9              MR. BIXENSTINE:  Objection.

10      A.     I don't know.

11      Q.     Do you believe it would be a

12  reasonable thing to expect that if Ms. Garrett

13  were told, "Linda, we're doing an audit.  One

14  result of the audit might be that we'll have to

15  remove you from your job," do you think it

16  would be reasonable to expect that she would

17  apply for other jobs with that information?

18              MR. BIXENSTINE:  Objection.

19      A.     I can't speak on behalf of

20  Ms. Garrett.  I don't know.

21      Q.     My question is:  Do you think it

22  would be reasonable --

23              MR. BIXENSTINE:  Objection.

24      Q.     -- would it be reasonable to

25  conclude that she would do that?

1             MR. BIXENSTINE:   Objection.
2        A.    Sure.
3        Q.    Okay.  And so backing up to my
4   application question.  One of the purposes you
5   identified in having an application is to get a
6   firm record of interest from the applicant,
7   correct?
8        A.    Sure, yes.
9        Q.    Your understanding is that you
10  didn't have that from Ms. Garrett in December
11  of 2012, correct?
12       A.    I don't know.
13       Q.    You're unaware of any?
14       A.    I'm unaware of any positions that
15  Ms. Garrett applied for at all.
16       Q.    And despite that, you were still
17  prepared to discuss the possibilities of other
18  opportunities for Ms. Garrett, correct?
19            MR. BIXENSTINE:   Objection, assumes
20  facts.
21            THE WITNESS:     Do I still answer?
22            MR. BIXENSTINE:   If you understand
23  the question, do your best to answer it.  I
24  believe it's an inappropriate question for a
25  variety of reasons, but that's why I've raised

Page 111

1        Q.    Back after a break.  I'm just about
2   done.  I've got one other document to show you.
3                  -   -   -   -   -
4                  (Thereupon, Deposition Exhibit 220,
5                  3/19/13 Email To Julie Chester From
6                  Cyndi Beattie, Etc., was marked for
7                  purposes of identification.)
8                  -   -   -   -   -
9        Q.    This is Exhibit 220.  You can look
10  through this.  Let me see if I can direct you
11  to what I am -- the email that I'm interested
12  in really looking at is the one that's on
13  page 3 that Linda sends to Erin Lyons on
14  March 6, 2013, and then in addition to that,
15  just to establish that elsewhere in the
16  document that this was forwarded to you, I
17  think on the first page.
18       We can agree that this entire email chain
19  you received in March of 2013 from Cyndi
20  Beattie, correct?
21       A.    Correct.
22       Q.    Okay.  If you would read Linda's
23  March 6 email and let me know when you're ready
24  to talk about it.
25       A.    Okay.

Page 112

1       Q.    I have a couple questions.  The

2   first is:  When this email chain was forwarded

3   to you a couple days after the first emails

4   were written, did you read them?  Do you

5   remember reading these things?

6       A.    I typically read them, yes, when

7   emails come across my desk.

8       Q.    That would include Linda's email to

9   Erin.  Do you remember reading that?

10      A.    I don't remember reading it, but if

11  I received it, then --

12      Q.    So whether it was from reading it

13  or from conversations with Erin, I just want to

14  confirm that you received this and had this

15  understanding.  A couple things Linda writes --

16  in her first paragraph, she writes that --

17              MR. BIXENSTINE:  Which page are you

18  on?

19              THE WITNESS:    Yeah.  Which page?

20              MR. PETROV:      I'm sorry.  Thank

21  you.

22      Q.    I'm on Linda's email, which is the

23  March 6, 2013, 7:11 p.m.

24              MR. BIXENSTINE:  You're on page 3?

25              MR. PETROV:      Yes.

Page 113

1          Q.    At the end of the first paragraph,
2    Linda states, "...I am not interested in
3    leaving UH or leaving the Dialysis Center.  I
4    wish to continue my employment there."  Did you
5    have that understanding in March of 2013?
6                MR. BIXENSTINE:  Did she have the
7    understanding that that was Linda Garrett's
8    position.  Is that the question?
9                MR. PETROV:      Yes.
10               MR. BIXENSTINE:  Okay.
11         A.    If I received this email then, yes,
12   I would have.
13         Q.    Okay.  In the second paragraph, she
14   talks about CROWNWeb.  I don't have questions
15   about that right now.  Then the third
16   paragraph, same thing, I don't have questions
17   about that.
18         Then in her fourth and fifth paragraphs,
19   she asked for a number of things.  She asked
20   for a reconsideration and reinstatement, right?
21         A.    Yes.
22         Q.    Then in the next paragraph, she
23   asks, if that's not a possibility, if she can
24   return to the dialysis center to perform duties
25   currently being completed by a temporary agency

Page 120

1   220, on the third page?

2       A.   Yes.

3       Q.   Do you see the reference to a

4   temporary agency person near the bottom of the

5   page?

6       A.   Yes.

7       Q.   It's down here.  (Indicating.)

8       A.   Right here.  (Indicating.)

9       Q.   Do you know whether as of March 6

10  of 2013 there was a temporary agency person

11  working within the dialysis center?

12      A.   I do not.

13      Q.   Turn to Exhibit 267.

14      A.   Um-hum.

15      Q.   There's a reference at the top of

16  the page to, "RFT secretary in the SIU."  Do

17  you know what, "RFT," refers to?

18      A.   Regular full-time.

19      Q.   And, "SIU," refers to?

20      A.   Special immunology unit.

21      Q.   This is in December of 2012.  Did

22  anyone have the authority to offer Ms. Garrett

23  a full-time position as a secretary in SIU?

24      A.   No.

25      Q.   Why not?

Page 121

1    A.    Because a position would have to be

2    posted within the SIU and Ms. Garrett did not

3    work in that department.

4    Q.    All right.  Did anyone have the

5    authority to place her as a secretary in SIU on

6    a temporary basis?

7    A.    Yes.

8    Q.    All right.  Who would have had

9    authority to do that?

10    A.    Robin Rowell, VP of clinical

11    institute operation.

12    Q.    Did you ever become aware that

13    Ms. Garrett had pursued a phone call with the

14    UH hotline?

15    A.    Was I aware?

16    Q.    Yes.

17    A.    Yes.

18    Q.    How did you become aware of that?

19    A.    Through my HR team, Cyndi Beattie

20    and Erin Lyons.

21    Q.    Okay.  Do you know a nurse by the

22    name of Kristen Hackett?

23    A.    Hackman.

24    Q.    Hackman.  Excuse me.

25    A.    Yes.

Page 123

1        Q.    Do you know whether Ms. Beno ever
2    became aware that the reason that Ms. Hackman
3    was reviewing CROWNWeb entries was because of
4    concerns raised by Ms. Garrett?
5        A.    Again, I do not know.
6        Q.    Okay.  I want you to turn to
7    interrogatory number 5 here that we were
8    looking at.
9        A.    Okay.
10       Q.    I want to put your focus on the
11   phone call with legal that you referred to in
12   your testimony earlier today concerning the
13   results of the CROWNWeb audit.  Okay?
14       A.    Okay.
15       Q.    You referred to some communications
16   between Cyndi Beattie and Robin Rowell.
17       A.    Correct.
18       Q.    Remind me again.  What was the
19   communication you were referring to?
20       A.    It was HR's recommendation that
21   Linda Garrett's position be eliminated because
22   it required the clinical background as
23   evidenced by the quality audit.
24       Q.    And you had some knowledge that
25   Ms. Beattie spoke with Ms. Rowell about that?

Page 124

1        A.    Yes.

2        Q.    How do you know that?

3        A.    Because we discussed it on that

4    call in that meeting, that Cyndi would follow

5    up directly with Robin to provide those

6    recommendations.

7        Q.    Do you have any knowledge of any

8    conversations between -- well, Ms. Blankschaen

9    reported to Ms. Rowell at the time?

10       A.    Yes.

11       Q.    Okay.  Do you have any knowledge

12   either directly or through others of any

13   conversations between Ms. Rowell and

14   Ms. Blankschaen concerning the recommendations

15   coming out of the CROWNWeb audit that took

16   place after that meeting with legal that you

17   referred to?

18            MR. PETROV:    Objection.

19       A.    I do not recall.

20            MR. BIXENSTINE:  I want to make

21   sure that's not a technical thing.

22            MR. PETROV:    I just thought it

23   was vague.  It was just vague.

24            MR. BIXENSTINE:  Okay.

25       Q.    Let me try it again.  Do you know

Page 128

1          A.     Correct.

2          Q.     Am I correct that Sue Blankschaen

3    was the director over those same areas?

4          A.     Sue is the director over some

5    areas, not all the areas under Robin.

6          Q.     She was director over the special

7    immunology unit, though, correct?

8          A.     Correct.

9               MR. PETROV:     That's all I have.

10              MR. BIXENSTINE:   Okay.

11          She'll read.

12              (Thereupon, the deposition

13               was adjourned at 12:03 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25